# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SUSAN J. LIVESAY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00039 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Susan J. Livesay, ("Livesay"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907

Case 2:13-cv-00039-PMS   Document 19   Filed 09/10/14   Page 1 of 32   Pageid#: 585

F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Livesay protectively filed her application for DIB on September 19, 2009, alleging disability as of March 15, 2008, due to an anxiety disorder, panic attacks, social anxiety, nerves, depression and stomach problems due to "the nerve problem." (Record, ("R."), at 19, 35, 180-81, 213, 217.) The claim was denied initially and on reconsideration. (R. at 105-09, 112, 114-16, 118-20.) Livesay then requested a hearing before an administrative law judge, ("ALJ"), (R. at 121-22.) The hearing was held by video conferencing on April 2, 2012, at which Livesay was represented by counsel. (R. at 33-73.)

By decision dated April 16, 2012, the ALJ denied Livesay's claim. (R. at 19-28.) The ALJ found that Livesay met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2013. (R. at 21.) The ALJ also found that Livesay had not engaged in substantial gainful activity since March 15, 2008, the alleged onset date. (R. at 21.) The ALJ found that the medical evidence established that Livesay suffered from severe impairments, namely affective disorder, anxiety disorder, personality disorder, anal fissure, chronic spastic colitis and gastritis, but he found that Livesay did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.) The ALJ found that Livesay had the residual functional capacity to perform a range of light work[1] that did not require the climbing of ladders, ropes or scaffolds, no more than occasional climbing of ramps or stairs, stooping, kneeling, crouching or crawling, that required no more than low-stress work, which he defined as requiring only occasional decision making

---

[1] Light work involves lifting items weighing up to 20 pounds at a time and lifting or carrying items weighing up to 10 pounds frequently. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

Case 2:13-cv-00039-PMS   Document 19   Filed 09/10/14   Page 2 of 32   Pageid#: 586

and occasional changes in the work setting, that required less than occasional interaction with the public and frequent interaction with co-workers and supervisors. (R. at 23.) The ALJ found that Livesay was unable to perform her past relevant work as a fast food worker. (R. at 27.) Based on Livesay's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Livesay could perform, including jobs as an assembler, a photocopy machine operator and a housekeeper. (R. at 27-28.) Thus, the ALJ found that Livesay was not under a disability as defined under the Act from March 15, 2008, through the date of the decision, and was not eligible for benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued his decision, Livesay pursued her administrative appeals, (R. at 14), but the Appeals Council denied her request for review. (R. at 1-5.) Livesay then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Livesay's motion for summary judgment filed January 15, 2014, and the Commissioner's motion for summary judgment filed February 14, 2014.

## II. Facts

Livesay was born in 1979, (R. at 180, 213), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and is a licensed cosmetologist in Virginia. (R. at 41, 223.) She has past relevant work experience as a cook and a cashier. (R. at 199, 218.) Livesay testified that she lived with her husband and three-year-old daughter. (R. at 40.) She stated that she did not drive because it made her "panicky." (R. at 40.) Livesay testified that she worked as a cook and a cashier at a take-out restaurant, which required her to lift

50-pound bags of potatoes and 25-pound oil jugs. (R. at 43-45.) She stated that she began experiencing panic attacks while working this job. (R. at 45.)

Livesay testified that she experienced diarrhea on a daily basis, which came on suddenly and required her to use the restroom five to 10 times daily. (R. at 46.) She testified that this diarrhea was partly due to her anxiety. (R. at 55.) She further stated that she had suffered from an anal fissure for approximately one year, which would tear open and bleed upon lifting too much. (R. at 51-52, 56.) She stated that her doctor thought it would heal itself if the diarrhea could be controlled. (R. at 56.) Livesay testified that she used an ointment and soaked in a tub to treat the fissure. (R. at 56.) She estimated that she could safely lift less than 25 pounds. (R. at 51-52.)

Livesay testified that she suffered from panic, anxiety and "nerves," resulting in her staying home. (R. at 46.) She stated that she usually had three to four panic attacks daily, lasting from 10 to 15 minutes each, then returning in approximately an hour. (R. at 46-47, 53.) Livesay testified that she began having panic attacks in August 2004, which she described as her head feeling "weird," sort of "black[ing] out," her heart racing and breaking out in a sweat. (R. at 47.) She stated that she had been tested for a seizure disorder due to the feeling of blacking out, but that had been ruled out. (R. at 56.) Livesay testified that she was taking medication for her panic problems, prescribed by Dr. Ford. (R. at 47.) Livesay stated that, although she was not seeing a psychologist or psychiatrist at that time because she could not afford it, she had seen a counselor at Lee County Behavioral Health Services, as well as Crystal Burke at Stone Mountain Health Services. (R. at 47.) However, she stated that she was waiting to pay her bills down before returning for additional mental health treatment. (R. at 47.) Livesay further testified that she suffered from depression on and off since 2004, for which Dr.

-4-

Ford prescribed medication. (R. at 47-48.)

Livesay testified that she had experienced a change in her weight over the previous couple of years due to anxiety induced vomiting, which occurred daily. (R. at 50.) She stated that her sleep was variable, and her depression drained her energy. (R. at 50-51.) She further stated that she had difficulty concentrating. (R. at 51.) Livesay described a typical day as using Facebook, talking on the phone with her mother and sometimes cooking for her daughter. (R. at 52.) She stated that she spent about an hour a day, off and on, using the computer. (R. at 52.) Livesay testified that her husband did the grocery shopping because she did not "do crowds." (R. at 52.) However, she stated that there were not any household chores that she could not do. (R. at 52.) Livesay testified that she might go out once a week to her mother's house, which was approximately seven miles from her home. (R. at 53.)

Vocational expert, Thomas Heiman, also was present and testified at Livesay's hearing. (R. at 57-68.) Heiman classified Livesay's work as a fast food cook as medium[2] and as an informal waitress and a cashier II as light. (R. at 58.) Heiman was asked to consider a hypothetical individual of Livesay's age, education and work history, who had no exertional limitations, but who was limited to low-stress work, which was defined as involving only occasional decision making and occasional changes in the work setting. (R. at 59.) This individual also could interact with the public less than occasionally, but could interact with co-workers and supervisors frequently. (R. at 59-60.) Heiman testified that such an individual could not perform Livesay's past work, but could perform other jobs existing in significant numbers in the national economy, including jobs

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time and lifting or carrying items weighing up to 25 pounds frequently. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2013).

as a hospital cleaner, a hand packager and a warehouse worker. (R. at 60.) Heiman next was asked to consider a hypothetical individual of Livesay's age, education and work history, who could lift items weighing up to 20 pounds occasionally and up to 10 pounds frequently, stand or walk for six hours and sit for six hours in an eight-hour workday with normal breaks, never climb ladders, ropes or scaffolds, occasionally climb ramps or stairs, stoop, kneel, crouch or crawl, and who possessed the same mental limitations as in the first hypothetical. (R. at 60-61.) Heiman testified that such an individual could perform the jobs of a small products assembler, a photocopy machine operator and a commercial housekeeping maid, all at the light level of exertion and all existing in significant numbers in the national economy. (R. at 61.) Next, Heiman was asked to assume an individual of Livesay's age, education and work history, but who was limited to lifting items weighing up to 10 pounds occasionally, standing or walking for about two hours and sitting for about two hours in an eight-hour workday, who would need to alternate between sitting or standing at 15-minute intervals, who should never climb ladders, ropes or scaffolds, who could climb ramps or stairs less than occasionally, who could occasionally stoop and kneel, but less than occasionally crouch, and who was limited to simple, routine and repetitive tasks in a low-stress job involving only occasional decision making and changes in the work setting and less than occasional interaction with the public, co-workers and supervisors. (R. at 61-62.) Heiman testified that such an individual would be precluded from performing any work. (R. at 62.) Heiman also testified that employers customarily tolerate one absence every other month. (R. at 63.) Heiman was asked to consider the same individual as in the second hypothetical, but who also would be off-task three to five times per day for approximately 10 minutes each in addition to regularly scheduled breaks. (R. at 63-64.) Heiman testified that such an individual could not perform the jobs previously cited. (R. at 64.) When Heiman was asked to consider the second hypothetical individual, but who was limited to no contact

with the public and less than occasional contact with co-workers and supervisors, he testified that such restrictions would erode the previously cited jobs of small parts assembler, copy machine operator and commercial housekeeping maid by 80 percent. (R. at 64-66.) Finally, Heiman testified that an individual who was unable to meet competitive standards in completing a workday, completing a workweek, dealing with stress and accepting instructions and supervision could not perform any jobs. (R. at 66-68.)

In rendering his decision, the ALJ reviewed medical records from Julie Jennings, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Zafar Ahsan, M.D., a psychiatrist; Karen Schooler, B.A.; Wellmont Lonesome Pine Hospital; Wellmont Holston Valley Medical Center; Medical Associates of Southwest Virginia; Dr. Michael Ford, M.D.; Wellmont Family Medicine; Highlands Pathology Consultants; Appalachia Medical Clinic; Comprehensive Neurology, Inc.; Dr. Edakandiyil Manoharan, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Donna Abbott, M.A., a senior psychological examiner; Lee County Behavioral Health Services, ("Frontier Health"); Pennington Family Health Center; Stone Mountain Health Services; Teresa Jarrell, M.A., a licensed psychologist; and Dr. Lance C. Dozier, M.D.

In an October 29, 2009, Function Report, Livesay stated that she cared for her young daughter, prepared food for herself and her husband, watched television and did laundry. (R. at 230-37.) However, she indicated that she needed motivation to do these things due to depression. (R. at 231.) Livesay reported that her husband helped care for their daughter. (R. at 232.) She denied any problems with personal care. (R. at 232.) Livesay stated that she could not go out alone because she felt nervous and shaky and like she was going to pass out or have a panic attack. (R. at 233.) She reported talking on the phone to family and using the computer to

communicate to distant family occasionally. (R. at 234.) She stated that she went to her parents' house on the weekends. (R. at 234.) Livesay reported problems getting along with others, noting that she tensed up and got agitated easily. (R. at 235.) She also reported an inability to communicate well with others and feeling different from others due to her panic attacks. (R. at 235.) She stated that her condition affected her ability to talk, to complete tasks, to understand and to get along with others, as well as her memory and concentration. (R. at 235.) Livesay estimated that she could pay attention for five to 10 minutes, but could not finish what she started. (R. at 235.) She rated her ability to follow written and spoken instructions as fair, and she reported not being able to get along well with authority figures due to stress and anxiety when in confrontational situations. (R. at 235-36.) She reported not being able to handle stress at all and not handling changes in routine well. (R. at 236.) She reported unusual behaviors and fears to include social phobia of being in crowds or public places and an inability to drive alone. (R. at 236.) She also reported feeling like people were out to get her or like they were talking about or looking at her. (R. at 236.) Livesay commented that in the previous five years, she felt helpless, even with medication. (R. at 237.) She stated that she always felt stressed and fearful and no longer cared about her appearance or anything else. (R. at 237.)

The record shows that Livesay was seen at Frontier Health for mental health counseling from January 7, 2005, through October 13, 2005. (R. at 263-75.) Over this time period, Livesay reported symptoms of panic disorder and panic attacks. (R. at 268, 270-72.) She reported taking Klonopin, as prescribed by her treating physician, Dr. Michael Ford, M.D., but wanted to try Paxil. (R. at 272.) She relayed repeated concerns about driving, stating that she would not drive alone. (R. at 268, 272.) Livesay's mood was consistently euthymic with congruent mood and affect. (R. at 268, 270-72.) On March 28, 2005, she saw Dr. Zafar Ahsan,

M.D., a psychiatrist. (R. at 268.) On mental status examination, Livesay was able to maintain logical, relevant conversation. (R. at 268.) She denied perceptual disorder or suicidal / homicidal ideas, and no pathological preoccupation was identified. (R. at 268.) Cognitive function was grossly intact, and judgment and insight were good. (R. at 268.) Dr. Ahsan concluded that Livesay continued to experience episodic anxiety attacks, which had not affected her functional capacity to a significant degree. (R. at 268.) Dr. Ahsan noted that, while she had difficulty driving alone, she had been able to go to public places to carry out her routine activities. (R. at 268.) Dr. Ahsan diagnosed Livesay with panic disorder without agoraphobia and generalized anxiety disorder, by history. (R. at 269.) He prescribed Paxil and suggested possible cognitive behavioral therapy and relaxation therapy. (R. at 269.) On October 13, 2005, Livesay was diagnosed with panic disorder with agoraphobia, generalized anxiety disorder and depressive disorder, and her then-current Global Assessment of Functioning, ("GAF"), score was placed at 45.[3] (R. at 274.)

An EEG report dated January 5, 2004, yielded normal results. (R. at 386.) Livesay saw Dr. Ford from September 20, 2004, to June 24, 2010. (R. at 305-404, 406-10, 414, 415-20, 428-29, 434-37, 460-64.) Livesay saw Dr. Ford on September 20, 2004, to establish a new patient relationship to follow up on a recent hospitalization and panic attacks. (R. at 342.) She endorsed nervousness and depression, as well as dizziness and tremors. (R. at 311.) She reported she had recently experienced a "spell" at work during which she "blacked out." (R. at 342.) She reported stress for the previous eight months to a year and that she was on

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] occupational, social, and school functioning on a continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates that the individual has serious symptoms or serious impairments in social, occupational or school functioning. *See* DSM-IV at 32.

Case 2:13-cv-00039-PMS   Document 19   Filed 09/10/14   Page 9 of 32   Pageid#: 593

Klonopin, but that her medications made her feel funny. (R. at 342.) On October 27, 2004, Livesay saw Dr. Ford for a follow-up on her panic attacks. (R. at 341.) She reported being fine on some occasions, noting that Klonopin helped some. (R. at 341.) Dr. Ford diagnosed depression, among other things, and continued her on Klonopin. (R. at 341.) On October 28, 2004, Dr. Ford noted a normal EEG, and he released Livesay to drive a vehicle. (R. at 392.) On November 9, 2004, Livesay reported that Lexapro was making her nervous. (R. at 391.) Dr. Ford prescribed Zoloft. (R. at 341.) When Livesay saw Dr. Ford on November 13, 2005, she reported that she did not like the Lexapro or Zoloft, and she stated that she was talking to a psychiatrist and taking Klonopin. (R. at 339.) Dr. Ford diagnosed anxiety and depression. (R. at 340.) A note from April 26, 2006, states that prescriptions were written for anxiety and depression. (R. at 389.) On December 18, 2006, Livesay complained of anxiety. (R. at 328.) Dr. Ford diagnosed anxiety and right lower quadrant pain. (R. at 328.) On April 26, 2007, Livesay reported having a "spell" at work, during which she felt "funny." (R. at 327, 400.) She reported experiencing an "aura" before it happened. (R. at 327, 400.) Dr. Ford diagnosed petit mal epilepsy, but Livesay declined a new workup. (R. at 327, 400.) Dr. Ford prescribed Klonopin on December 4, 2007. (R. at 349.)

When Livesay visited Dr. Ford on July 10, 2008, she was continuing to take Klonopin. (R. at 323, 397.) She was 33 weeks pregnant at that time. (R. at 323, 397.) Livesay gave birth by Cesarean section on August 19, 2008, without complications. (R. at 287-91.) On September 2, 2008, Livesay reported that she had given birth and was doing well. (R. at 321, 396.) However, she continued to report dizzy spells, blurred vision and an inability to deal with stress. (R. at 321, 396.) Dr. Ford diagnosed social phobia, rule out petit mal epilepsy. (R. at 321, 396.) He ordered an EEG and bloodwork. (R. at 321, 375-76, 396.) The EEG, performed on September 25, 2008, yielded normal results. (R. at 297, 365, 404,

490.) On February 2, 2009, Dr. Ford prescribed Clonazepam. (R. at 346.) On March 11, 2009, Dr. Ford continued to diagnose Livesay with anxiety. (R. at 306, 395.) On April 20, 2009, Dr. Ford prescribed Klonopin. (R. at 345.) On June 24, 2009, Livesay had no new complaints. (R. at 305, 394.) On September 17, 2009, she reported a possible gallbladder problem. (R. at 408.) Dr. Ford noted that Livesay would not drive secondary to anxiety. (R. at 408.) He opined that she was unable to work secondary to phobias. (R. at 408.) He diagnosed symptoms of cholelithiasis, among other things. (R. at 408.)

A January 12, 2010, ultrasound of the upper abdomen revealed multiple gallstones. (R. at 409, 418, 436, 470, 486.) On January 28, 2010, Livesay complained of loose stools for the previous three to four weeks after eating. (R. at 415.) Dr. Ford diagnosed gallstones and referred her to Dr. Lance Dozier, M.D., a surgeon. (R. at 415.) On this referral form, Dr. Ford noted that Livesay suffered from phobias of other people and crowds and that she suffered from panic attacks. (R. at 420.)

On March 4, 2010, Livesay saw Dr. Dozier with complaints of epigastric and right upper quadrant abdominal pain with radiation to the back for the previous two years, intermittently. (R. at 469-70.) Dr. Dozier reported that workup by Dr. Ford revealed cholelithiasis. (R. at 469.) He noted a past medical history of anxiety and panic attacks. (R. at 469.) Livesay reported diarrhea at times, but denied constipation, rectal bleeding or vomiting. (R. at 469.) She endorsed depression, anxiety and panic attacks, but denied memory loss and confusion. (R. at 469.) Livesay was awake, alert and oriented. (R. at 470.) Dr. Dozier diagnosed cholelithiasis and biliary colic, and he recommended a laparoscopic cholecystectomy. (R. at 470.) Livesay underwent surgery on March 4, 2010, and was released the same day in stable condition. (R. at 471-76.) On April 12, 2010,

Livesay reported loose stools since undergoing the surgery. (R. at 435.)

Livesay saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, and Donna Abbott, M.A., senior psychological examiner, on April 7, 2010, at the request of Disability Determination Services. (R. at 422-27.) They performed only a mental status evaluation of Livesay, as no psychological testing was requested. (R. at 422-27.) Livesay reported not having driven since two months previously. (R. at 422.) She reported anxiety, depression, panic attacks and social phobia. (R. at 422.) She also reported recently having her gallbladder out, but no other health problems. (R. at 423.) Livesay stated that she was taking Clonazepam. (R. at 423.) On mental status evaluation, Livesay was appropriately oriented, cooperative and conversational. (R. at 423.) Her memory processes were intact, but her effort seemed marginal. (R. at 423.) She could attend and concentrate without difficulty, follow directions, and questions did not have to be repeated excessively. (R. at 424.) Livesay's intellectual functioning was estimated to be in the low average range. (R. at 424.) Her affect was fairly appropriate, she did not seem particularly anxious or depressed, eye contact was good, and there were no observable tremors or psychomotor retardation. (R. at 424.) Livesay denied hallucinations. (R. at 424.) She reported some suicidal ideation in the past, but no attempts, and none current. (R. at 424.) Livesay appeared rational and alert. (R. at 424.) Her symptom presentation was deemed partially credible. (R. at 424.)

Livesay reported that she began becoming more nervous after a break-up with a boyfriend in January 2004. (R. at 424.) She stated that she smoked marijuana later that same night and had a panic attack. (R. at 424.) She was hospitalized for two days, but was sent home without a diagnosis. (R. at 424.) Livesay stated that she returned to work, but in September 2004, she had a "spell," during which everything seemed blurry, her heart rate increased, and she felt like

she was going to pass out. (R. at 424.) Her mother took her to the emergency room, and she was placed on Klonopin. (R. at 424.) Thereafter, she began seeing Dr. Ford. (R. at 424.) Livesay described daily panic attacks, noting that her doctor had recently increased her medication, which had helped some. (R. at 424.) She described her panic attacks as "not real bad" and lasting from 15 minutes to an hour. (R. at 424.) Livesay described her daily activities to include feeding and bathing her child, taking her medicine, cleaning house and watching television. (R. at 425.) She stated that she did laundry once weekly and went to the grocery store, sometimes going in, and sometimes sitting in the car while her husband went in. (R. at 425.) Livesay reported managing the household bills. (R. at 425.) She reported enjoying using the computer, but stated that she did not have any friends. (R. at 425.) She stated that she visited her parents on the weekends. (R. at 425.)

Livesay related without difficulty and appeared capable of managing her resources. (R. at 425.) She was diagnosed with panic disorder without agoraphobia, and her then-current GAF score was placed at 54.[4] (R. at 425-26.) Livesay's intellectual ability was estimated to be most likely in the lower range of the low average level. (R. at 426.) Lanthorn and Abbott concluded that Livesay could understand and remember, attend and concentrate and maintain basic routines. (R. at 426.) They also found that Livesay's social interaction did not appear to be significantly limited, as she related appropriately, laughed and was friendly. (R. at 426.) Her general adaptation skills showed overall moderate limitations, but she could be aware of simple hazards and take precautions. (R. at 426.) Lanthorn and Abbott found that she should be able to set goals and make plans to achieve them, and she should be able to work in proximity to others. (R. at 426.) They found that Livesay may have moderate difficulty dealing with stress and mild to moderate

---

[4] A GAF score of 51-60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM-IV at 32.

difficulty adapting to change. (R. at 426.) They concluded that Livesay's panic attacks should be amenable to treatment and recommended involvement with a psychiatrist and / or counselor. (R. at 426.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique, ("PRT"), of Livesay on May 4, 2010, finding that she suffered from an anxiety-related disorder, but that a physical and / or mental residual functional capacity assessment was necessary. (R. at 91-94.) Leizer opined that Livesay experienced no limitations in her activities of daily living, mild difficulties maintaining social functioning and maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 91.) Leizer noted that Livesay's mental condition had not significantly affected her abilities to remember, understand, communicate with others or perform normal daily activities. (R. at 94.)

A case manager from Frontier Health completed a screening of Livesay on May 21, 2010, and she was referred for therapy and scheduled for intake on June 2, 2010. (R. at 455.) On June 2, 2010, Kathleen O'Dell, LPC, a licensed professional counselor, completed an intake interview of Livesay. (R. at 454.) Intake forms reflect that Livesay was referred by Dr. Ford for treatment of depression and anxiety, which began approximately six years previously. (R. at 442.) It was noted that Livesay was taking Clonazapam and had been taking benzodiazapines for six years. (R. at 442.) Reported symptoms included occasional crying spells, irritability, low self-esteem, feelings of helplessness, hopelessness, worthlessness, occasional sleep disturbance, excessive worrying, poor concentration, racing heart, sense of breathlessness and isolation due to fear of recurring symptoms. (R. at 442.) Livesay reported treatment in 2004-2005 at Frontier Health on an outpatient basis, with little improvement despite compliance. (R. at 442.) She reported

generally good health, but discussed problems with diarrhea after gallbladder surgery two months previously. (R. at 442.) Livesay reported moderate decrease in energy or fatigue, social withdrawal, anxiety, panic attacks, worrying, irritability, loss of interest or pleasure, low self-esteem and marked mood shifts. (R. at 444-46.) She reported mild academic or work inhibition, jitteriness, avoidance behavior, distractibility, indecisiveness, anger, depressed mood, feeling worthless, helplessness, hopelessness, tearfulness and insomnia. (R. at 444-46.) O'Dell diagnosed major depressive disorder, single episode, and generalized anxiety, and she placed Livesay's then-current GAF score at 55. (R. at 447.) By letter dated June 2, 2010, O'Dell informed Dr. Ford that Livesay was receiving services at Frontier Health and that she had been diagnosed with major depressive disorder, single episode, and generalized anxiety disorder. (R. at 438.) Livesay canceled her appointment scheduled for June 15, 2010, and she failed to attend her June 29, 2010, appointment. (R. at 449, 452.)

In a Disability Report dated June 16, 2010, Livesay reported inability to go to the store alone or drive alone. (R. at 243.) She also reported having difficulty getting motivated to do household chores and attend to personal hygiene. (R. at 243.) On June 24, 2010, Livesay reported that she was being seen at Frontier Health, as well as Stone Mountain. (R. at 434.) Dr. Ford found that Livesay was disabled from working with the public, stating that she suffered from severe agoraphobia. (R. at 434.) Livesay continued to take Klonopin. (R. at 434.) Dr. Ford diagnosed depression and anxiety (bipolar) disorder. (R. at 434.)

On June 30, 2010, Livesay saw Crystal Burke, LCSW, a licensed clinical social worker at Stone Mountain Health Services, for a behavioral health consultation. (R. at 459, 468.) She reported that she was taking Klonopin prescribed by Dr. Ford. (R. at 459, 468.) She reported extreme panic attacks and

that Zoloft and Lexapro made her feel worse. (R. at 459, 468.) Livesay stated that she was almost paranoid of taking medication. (R. at 459, 468.) She reported that her problems started in 2004 after her boyfriend broke up with her, and she smoked a marijuana joint. (R. at 459, 468.) She stated that she had not been the same since. (R. at 459, 468.) Livesay reported an inability to work and go into stores, stating that her husband and mother did most of her shopping. (R. at 459, 468.) She stated that she did only what was required to take care of her 21-month-old child. (R. at 459, 468.) Livesay stated that, before her child was born, she spent much of her time in bed, reporting that she still slept a lot and laid in bed often. (R. at 459, 468.) She stated that she had tried to work before, but had not been able to return. (R. at 459, 468.) Livesay denied any suicidal or homicidal ideations. (R. at 459.) Burke described Livesay as alert and oriented, but rather anxious, somewhat "giggly" in her presentation and having poor eye contact. (R. at 459, 468.) She concluded that Livesay appeared to have symptoms of an anxiety disorder, quite possibly panic disorder with agoraphobia. (R. at 459, 468.) Burke discussed coping strategies with her and encouraged medications. (R. at 459, 468.)

Julie Jennings, Ph.D., another state agency psychologist, completed a PRT of Livesay on July 28, 2010, finding that she suffered from a nonsevere anxiety-related disorder. (R. at 101-04.) Jennings opined that Livesay had no limitations in her activities of daily living, had mild difficulty maintaining social functioning and maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration. (R. at 101.)

Livesay returned to Burke on August 4, 2010, reporting that she was still very anxious. (R. at 467.) She stated that she withdrew from activities, allowing others to do things that she needed to do, especially in public situations. (R. at 467.) Livesay reported some stress with her mother-in-law. (R. at 467.) She stated

that she spent much of her time in bed or lying on the couch, only getting up when her toddler daughter needed something. (R. at 467.) She denied any suicidal or homicidal ideations. (R. at 467.) Burke found that Livesay was alert and oriented, but her mood appeared anxious and mildly depressed. (R. at 467.) Livesay continued to report symptoms of anxiety. (R. at 467.) Burke discussed coping strategies and relaxation techniques. (R. at 467.) Livesay returned to Burke on September 7, 2010, stating things were "the same." (R. at 466.) She reported that she had recently given her daughter a birthday party, but had to have a lot of family assistance to make it successful. (R. at 466.) Livesay continued to report family stress. (R. at 466.) She stated that she was trying to get out of the house once a week to see her mother. (R. at 466.) Livesay reported getting easily down and frustrated, but denied any suicidal or homicidal ideations. (R. at 466.) She was alert and oriented, but appeared anxious and had difficulty maintaining any eye contact. (R. at 466.) Burke reported that Livesay continued to exhibit problems with anxiety and low mood. (R. at 466.) Burke stated that she had very poor coping strategies. (R. at 466.) She encouraged activities and discussed coping strategies. (R. at 466.) On December 7, 2010, Livesay complained of continued problems with anxiety and poor sleep. (R. at 465.) Burke noted that Livesay was alert and oriented, but anxious. (R. at 465.) She diagnosed anxiety disorder, not otherwise specified, and she discussed coping strategies with Livesay and encouraged activities. (R. at 465.) Livesay reported putting her daughter in a pageant recently, which went well. (R. at 465.)

Livesay presented to the emergency department at Lonesome Pine Hospital on August 4, 2011, with rectal bleeding for two days' duration. (R. at 478-79.) She reported history of an anal fissure. (R. at 478.) Livesay also reported anxiety and social anxiety. (R. at 478.) She was diagnosed with hyperkalemia and given medication. (R. at 479.)

An October 24, 2011, upper abdominal ultrasound revealed no significant abnormality, and a pelvic ultrasound showed endometrial thickness of 1.2 centimeters, but was otherwise normal. (R. at 488-89.)

Livesay saw Teresa E. Jarrell, M.A., a licensed psychologist, for a consultative psychological evaluation at the request of her attorney on February 21, 2012. (R. at 496-507.) Livesay reported that she stopped working due to severe panic attacks. (R. at 496.) She reported her health problems to include frequent diarrhea and frequent episodes of vomiting and episodes of dizziness and rapid heart rate. (R. at 497.) She also stated that things "get blurry and black" at these times, so she avoided driving. (R. at 497.) Livesay reported being hospitalized overnight after her first panic attack, but never having received inpatient psychiatric treatment. (R. at 497.) She stated that she was taking Klonopin, Zoloft and Lomotil. (R. at 497.) Livesay reported that she had an appointment scheduled with Stone Mountain Community Mental Health Services the following month, where she had treated in the past, but had to discontinue services due to inability to pay. (R. at 497.) She reported variable sleep and appetite. (R. at 497.) She stated that she would not eat anything if she had to go anywhere due to frequent nausea and vomiting. (R. at 497.) Livesay reported that she could maintain her personal hygiene without assistance and prepare simple convenience foods for her daughter, but did not generally cook meals. (R. at 498.) She stated that her husband did most of the grocery shopping, noting that, if she went, she usually had to leave early. (R. at 498.) She further stated that she was not very motivated to do housework. (R. at 498.) Livesay stated that she watched television with her daughter and sometimes used the computer for Facebook, but not very much. (R. at 498.) She reported that she used to enjoy playing softball, attending concerts and races and eating out, but no longer did so due to her symptoms of depression and anxiety. (R. at 498.)

Livesay reported seeing her parents, sister and nephew on the weekends. (R. at 498.) She reported no ongoing friendships, no socialization with neighbors and that she did not attend church. (R. at 498.)

Jarrell noted that Livesay was mildly anxious with a mildly depressed mood and restricted affect. (R. at 499.) Her speech was not spontaneously generated, but was normal in rate and volume. (R. at 499.) Livesay clearly endorsed symptoms consistent with depression, generalized anxiety disorder and panic attacks. (R. at 499.) She estimated that she had experienced symptoms of depression "for a while," but had noticed it had worsened over the previous year. (R. at 499.) Livesay reported that her problems with panic attacks developed prior to the depressive symptoms. (R. at 499.) She also reported excessive worrying. (R. at 499.) Livesay was alert, attentive and cooperative throughout the interview, and she appeared satisfactorily motivated in answering the questions asked of her. (R. at 499.) Her thought process was linear and goal directed, and thought content was consistently relevant to the questions asked. (R. at 499.) She did endorse problems with paranoid types of thoughts and suicidal ideation without specific intent or plan. (R. at 499.)

On mental status examination, Livesay was oriented in all spheres. (R. at 499.) Immediate memory was within normal limits, recent memory was moderately deficient and remote memory was mildly deficient. (R. at 499.) Her capacity for concentration was moderately deficient, and insight was mildly deficient, but judgment was within normal limits. (R. at 499-500.) Jarrell also administered the Personality Assessment Inventory, ("PAI"). (R. at 500-05.) Livesay's score on the Anxiety Scale was markedly elevated, reflecting a generalized impairment associated with anxiety. (R. at 502.) Such score indicated that her life was likely to be seriously constricted, not being able to meet even

minimal role expectations without feeling overwhelmed, and mild stressors being likely to precipitate a crisis. (R. at 502.) Her scores further indicated that she was likely to worry to a degree that the ability to concentrate and attend was significantly compromised. (R. at 502.) Jarrell noted that Livesay's score on the Anxiety-Related Disorder Scale was in the range considered to be moderately elevated, suggesting impairment associated with fears surrounding some situations. (R. at 502.) She noted that such individuals may be viewed as insecure and self doubting, ruminative and particularly uncomfortable in social situations. (R. at 502.) Livesay's scores further indicated that she was likely to exhibit phobic behaviors that interfered in some significant way in her life and would monitor her environment in an unrealistically vigilant fashion to avoid contact with the feared object, which likely would be constricting on life activities. (R. at 502-03.) Livesay's scores indicated that she was likely to have multiple phobias or a more distressing phobia, such as agoraphobia, than to suffer from a simple phobia. (R. at 503.) Lastly, Livesay's scores indicated that she likely had experienced some disturbing event in the past which continued to distress her and produce recurring episodes of anxiety. (R. at 503.)

Livesay's score on the Depression Scale was in a range considered markedly elevated, which supported a diagnosis of major depressive disorder, indicating she was likely to feel hopeless, discouraged and useless. (R. at 503.) She was likely to be withdrawn and feel misunderstood by others and have no energy or motivation to pursue interests. (R. at 503.) Livesay's score on the Paranoia Scale was considered mildly elevated and indicated that she may seem sensitive, tough minded and skeptical. (R. at 503.) Her score on the Schizophrenia Scale also was considered mildly elevated, indicating that she might be seen as withdrawn, aloof and unconventional. (R. at 504.) Livesay's score on the Borderline Features Scale was considered moderately elevated, indicating that she was likely to be impulsive

and emotionally labile, to feel misunderstood by others and to find it difficult to sustain close relationships. (R. at 504.) Livesay's score on the Aggression Scale was moderately elevated, indicating chronic anger. (R. at 505.) Her score also indicated that she was likely to be perceived by others as being hostile and easily provoked. (R. at 505.) Livesay's score on the Warmth Scale indicated a person with little interest or investment in social interactions. (R. at 505.)

Jarrell diagnosed Livesay with major depressive disorder, recurrent, severe, without psychotic features; panic disorder with agoraphobia; generalized anxiety disorder; and personality disorder, not otherwise specified; and she placed her then-current GAF score at 55. (R. at 506.) Jarrell reported that the PAI clearly substantiated severe problems with depression and anxiety, as well as a preoccupation with her health and functional impairment due to such preoccupation. (R. at 506.) She also noted indicators of traumatic stress. (R. at 506.) Jarrell also noted that the PAI supported a diagnosis of agoraphobia, as well as symptoms of personality disorder. (R. at 506.) Jarrell found that, due to Livesay's frequent problems with dizziness, nausea and diarrhea, as well as the severity of psychiatric symptoms in evidence at that current time despite medication management, Livesay would have great difficulty meeting expectations of attendance, punctuality, pace or persistence in any work setting. (R. at 506.) She noted that the PAI indicated likely difficulties in concentration, resulting in difficulties successfully completing even simple tasks on a repetitive basis in a full-time work environment. (R. at 506.) Jarrell noted that, even on a short task, in a quiet testing situation, Livesay's capacity for concentration was moderately deficient. (R. at 506.) She further noted deficiencies in recent and remote memories, indicating that such impairments would interfere with the ability to successfully carry out work instructions on a sustained basis. (R. at 507.) Jarrell noted that the PAI clearly substantiated that difficulties in social interactions were

highly likely, and a diagnosis of agoraphobia was supported by the results, indicating that she would have difficulty successfully relating on a sustained basis to co-workers, supervisors and even the general public. (R. at 507.) According to Jarrell, these factors indicated that Livesay would have great difficulty making necessary personal-social adjustments in any work setting. (R. at 507.) She concluded that Livesay needed more intensive treatment in order for her psychiatric symptoms to improve, and she rated her prognosis as very guarded with treatment and poor without. (R. at 507.)

On March 16, 2012, Dr. Ford completed a Physical Residual Functional Capacity Questionnaire of Livesay. (R. at 460-64.) Dr. Ford noted that he had treated Livesay since 2009 and that he saw her every six to eight weeks and on an as needed basis. (R. at 460.) Dr. Ford listed Livesay's diagnoses as anal fissure, chronic spastic colitis, ulcers (gastritis), bipolar illness, depression with neurosis, psychosocial disorder, anxiety and chronic nausea. (R. at 460.) He assessed her prognosis as guarded at best, depending on Livesay's compliance with orders and medications as prescribed. (R. at 460.) Dr. Ford described Livesay's symptoms as abdominal pain, debilitating diarrhea, depression, reluctance to leave home, be in a crowd, handle social stress or be in social situations, anxiety, chronic nausea and vomiting that, along with diarrhea, is unpredictable as to when / where it occurred and how long it lasted. (R. at 460.) Dr. Ford described Livesay's pain as severe abdominal pain caused by nausea, vomiting and diarrhea, as well as back pain due to an anal fissure. (R. at 460.) He described clinical findings and objective signs to include that Livesay was slow to stand and walk, inability to sit or stand for long periods without moving or repositioning, that she showed obvious pain and discomfort with spastic colon and that she was very self conscious of possible "accidents" with diarrhea in public. (R. at 460.) Dr. Ford stated that Livesay took Klonopin for anxiety, which could cause drowsiness, Lomotil for diarrhea, which

could cause drowsiness and dizziness, Bentyl, which could cause drowsiness, dizziness and unsteady gait, and Paxil for social anxiety, which could cause dizziness and nervousness. (R. at 460.) Dr. Ford opined that Livesay's impairments had lasted or could be expected to last for at least 12 months. (R. at 460.) Dr. Ford found that Livesay was not a malingerer and that emotional factors contributed to the severity of her symptoms and functional limitations. (R. at 461.) He opined that depression, psychological factors, anxiety and personality disorder affected her physical condition. (R. at 461.) Dr. Ford opined that Livesay's physical impairments plus any emotional impairments were reasonably consistent with the symptoms and functions described in the evaluation. (R. at 461.) He opined that Livesay would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks during a typical workday. (R. at 461.) He further opined that she was incapable of even "low stress" jobs due to bipolar illness, psycho social disorder, self image and self consciousness and increased stress and anxiety levels. (R. at 461.)

Dr. Ford opined that Livesay could not walk any city blocks without rest or severe pain, that she could sit for a total of less than two hours in an eight-hour workday, but for 15 minutes without interruption, and stand/walk for a total of less than two hours in an eight-hour workday, but stand for only 15 minutes without interruption. (R. at 461-62.) He opined that Livesay must walk around every 15 minutes for five minutes. (R. at 462.) Dr. Ford opined that she would need a job that permitted shifting positions at will from sitting, standing or walking and that she would sometimes need to take unscheduled breaks during an eight-hour workday. (R. at 462.) He estimated that she would need to take three to five such unscheduled breaks, lasting from 10 to 15 minutes each. (R. at 462.) Dr. Ford opined that Livesay could occasionally lift and carry items weighing up to 10

pounds, rarely lift and carry items weighing up to 20 pounds and never carry items weighing up to 50 pounds. (R. at 462.) He based these lifting restrictions on Livesay's anal fissure, stating that pressure and pain caused by lifting could be severe. (R. at 462.) Dr. Ford opined that she could frequently look down, turn her head to the left or right, look up and hold her head in a static position. (R. at 463.) He found that she could occasionally twist and stoop (bend), rarely crouch / squat and climb stairs, but never climb ladders. (R. at 463.) Finally, Dr. Ford opined that, on average, Livesay would be absent from work more than four days per month due to her impairments or treatment. (R. at 463.)

On March 30, 2012, Jarrell completed a Mental Residual Functional Capacity Questionnaire of Livesay based on her February 21, 2012, evaluation. (R. at 491-95.) She found that Livesay had an unlimited or very good ability to adhere to basic standards of neatness and cleanliness and a limited, but satisfactory, ability to understand and remember very short and simple instructions, make simple work-related decisions, ask simple questions or request assistance and interact appropriately with the general public. (R. at 493-94.) Jarrell found that Livesay had a seriously limited, but not precluded, ability to remember work-like procedures, carry out very short and simple instructions, sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being unduly distracted, to perform at a consistent pace without an unreasonable number and length of rest periods, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to be aware of normal hazards and take appropriate precautions, to set realistic goals or make plans independently of others and to maintain socially appropriate behavior. (R. at 493-94.) Jarrell found that Livesay was unable to meet competitive standards in her ability to maintain attention for two-hour segments, to complete a normal workday and workweek without interruptions from psychologically based

symptoms, to accept instructions and respond appropriately to criticism from supervisors, to deal with normal work stress, to understand, remember and carry out detailed instructions, to deal with stress of semi-skilled and skilled work, to travel in unfamiliar places and to use public transportation. (R. at 493-94.) Jarrell found that Livesay had no useful ability to function regarding her ability to maintain regular attendance and be punctual within customary, usually strict tolerances. (R. at 493.) Jarrell estimated that, on average, Livesay's impairments would cause her to be absent from work about four days per month. (R. at 495.) She further stated that Livesay's impairments had lasted or could be expected to last at least 12 months. (R. at 495.) Jarrell found that Livesay was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. (R. at 495.) In addition to the reasons stated in the consultative evaluation, Jarrell also stated the following with regard to any additional reasons why Livesay would have difficulty working at a regular job on a sustained basis. (R. at 495.) She stated that Livesay reported physical health problems, including frequent vomiting, frequent diarrhea, dizziness, rapid heart rate, changes in sleep patterns and weight loss, which were a clear hindrance to her ability to meet performance expectations of attendance and punctuality in a competitive, full-time work setting. (R. at 495.) Jarrell further noted that the severity of Livesay's depression and anxiety, as well as the nature of her physical health problems, would negatively impact pace and persistence in task completion. (R. at 495.) However, she found that Livesay could manage benefits in her own best interest. (R. at 495.) Jarrell stated that she could not determine the earliest date that the limitations she found applied. (R. at 495.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20

C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Livesay argues that the ALJ's decision denying her claim for DIB benefits is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-17.) More specifically, she argues that the ALJ failed to give appropriate weight to the opinion of Dr. Ford, her treating physician. (Plaintiff's Brief at 8-12.) Livesay also argues that the ALJ failed to give appropriate weight to the opinion of psychologist Jarrell, an examining source. (Plaintiff's Brief at 12-17.)

Livesay first argues that the ALJ erred by giving minimal weight to the

opinion of her treating physician, Dr. Ford. (Plaintiff's Brief at 8-12.) Based on my review of the record, I find that substantial evidence supports the ALJ's weighing of the evidence with regard to Livesay's physical impairments. The ALJ generally must give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King*, 615 F.2d at 1020, an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

In his decision, the ALJ stated that he was giving Dr. Ford's opinion limited weight because the great level of limitation he assigned to Livesay in the March 21, 2012, physical assessment was supported neither by the objective medical evidence nor the record as a whole. (R. at 26.) I note, first, that the Commissioner is incorrect in her assertion that Livesay did not initially allege a disabling physical impairment. In a Disability Report dated September 23, 2009, Livesay stated that her disabling conditions included stomach problems due to a nerve problem. (R. at 217.) Nonetheless, I find that Dr. Ford's very restrictive assessment is not supported by the objective evidence or the record as a whole. As stated herein, Dr. Ford's treatment notes are very difficult to decipher, but this court has done its best to do so. However, this court has not been able to discern from Dr. Ford's

treatment notes the placement of any restrictions on Livesay or any notations by Dr. Ford regarding her level of pain or discomfort due to her impairments. The limited diagnostic testing contained in the record includes an abdominal ultrasound, which showed gallstones, for which Livesay underwent surgery, an October 2011 upper abdominal ultrasound, which showed no significant abnormality and a pelvic ultrasound, which showed endometrial thickness of 1.2 centimeters, but was otherwise normal. Despite Livesay's assertions of frequent diarrhea, which she claimed resulted in her not eating anything before leaving her home for fear of having an "accident" in public, there is no evidence of any other diagnostic testing that has been performed or even suggested for this ailment. Instead, Livesay's diarrhea has been treated conservatively with medications. As for the anal fissure, it also appears to have been treated conservatively. Livesay testified that Dr. Ford believed the fissure would heal on its own once the diarrhea was controlled, he prescribed an ointment to treat it, and he advised her to soak in a tub. Additionally, I find that the lifting restrictions encompassed within the ALJ's physical residual functional capacity finding accommodate this physical impairment. Although Dr. Ford opined in March 2012 that Livesay could lift objects weighing up to 10 pounds occasionally and up to 20 pounds rarely, these restrictions are not reflected in his own treatment notes of Livesay, nor is there any objective evidence in the record to support these restrictions. Livesay simply testified at her hearing that she could safely lift less than 25 pounds.

Furthermore, despite the lack of any opinion evidence from the state agency with regard to Livesay's physical impairments, there has been no allegation that the evidence before the ALJ was not sufficient to make a determination regarding disability. That being the case, and because I also find that the evidence before the ALJ was sufficient, I find that no physical consultative examination is necessary. The record is clear that Dr. Ford's treatment notes are lacking in restrictions, and

there are no objective findings to support such restrictive findings as contained in his March 2012 physical assessment. All of this being the case, I find that substantial evidence supports the ALJ's decision to give little weight to Dr. Ford's opinion regarding Livesay's physical restrictions.

Livesay also argues that the ALJ erred by failing to give appropriate weight to the opinion of examining psychologist, Teresa Jarrell. (Plaintiff's Brief at 12-17.) The ALJ stated that he was giving minimal weight to Jarrell's opinion because it was inconsistent with the findings of psychologist Lanthorn, as well as the record as a whole. (R. at 27.) The ALJ further noted that Jarrell's opinion was rendered several years after the alleged onset date and that there was no evidence to suggest that the level of impairment described therein existed at any other time during the relevant time period. (R. at 27.) Lastly, the ALJ noted that there was no evidence that the level of impairment found by Jarrell had lasted, or could be expected to last, at least 12 consecutive months. (R. at 27.) For the reasons that follow, I find that substantial evidence does not support the ALJ's weighing of the psychological evidence.

First, Jarrell's opinion is supported by the psychological testing she administered to Livesay on February 21, 2012. More specifically, the PAI results, which Jarrell deemed valid, indicated markedly elevated scores on the Anxiety Scale and the Depression Scale and moderately elevated scores on the Anxiety-Related Disorder Scale, Borderline Features Scale and Aggression Scale. Her results indicated severe problems with depression and anxiety and functional impairments due to a preoccupation with her health. These results further supported a diagnosis of agoraphobia and symptoms of personality disorder. Livesay's test results supported the conclusion that she would have great difficulty meeting attendance, punctuality, pace or persistence expectations in any work

setting. Jarrell also completed a mental status examination of Livesay, finding that she was mildly anxious with a mildly depressed mood and restricted affect, that she did not spontaneously generate speech, that her recent memory was moderately deficient, remote memory was mildly deficient, capacity for concentration was moderately deficient, and insight was mildly deficient. In March 2012, Jarrell opined that Livesay was unable to meet competitive standards in the majority of work-related mental abilities and aptitudes rated. She noted very detailed explanations for the limitations imposed, which she based on the mental status examination and PAI results.

I find that Jarrell's opinion is supported by the findings of Livesay's treating physician, Dr. Ford. Dr. Ford began treating Livesay for mental health issues in 2004. During the time period relevant to this decision, Dr. Ford diagnosed her with anxiety and depression, he placed her on various medications, including Clonazepam and Klonopin, and he referred her for mental health counseling. On September 17, 2009, Dr. Ford stated on a referral form that Livesay suffered from phobias of other people and crowds and suffered panic attacks. On June 24, 2010, Dr. Ford opined that Livesay was disabled from working with the public due to severe agoraphobia. In a March 2012 physical assessment, Dr. Ford found, among other things, that Livesay's impairments has lasted or could be expected to last at least 12 months and that she was not a malingerer. He further noted that emotional factors contributed to the severity of her symptoms and functional limitations. Dr. Ford opined that Livesay would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks during a typical workday, that she was incapable of even low-stress jobs due to bipolar illness, psychosocial disorder, self image and self consciousness and increased stress and anxiety levels and that she would be absent from work, on average, more than four days monthly due to her impairments or

treatment. This opinion supports Jarrell's opinion.

Also during the relevant time period, Livesay sought mental health counseling. In June 2010, she was diagnosed by licensed professional counselor O'Dell as having major depressive episode, generalized anxiety and a GAF score of 55. The same month, Livesay saw Crystal Burke, a licensed clinical social worker, who described her as rather anxious, somewhat "giggly" in presentation and having poor eye contact. Burke reported that Livesay appeared to have symptoms of an anxiety disorder, quite possibly a panic disorder with agoraphobia. She encouraged medications. By August 2010, Burke described Livesay's mood as anxious and mildly depressed. In October 2010, Burke again noted that Livesay was anxious and had difficulty maintaining any eye contact. Burke found that Livesay continued to exhibit problems with anxiety and low mood. By December 2010, Burke again noted that Livesay was anxious, and she diagnosed her with an anxiety disorder, not otherwise specified.

I agree that Jarrell's opinion is not supported by the state agency psychologists' opinions. However, I further note that these opinions were rendered in May and July 2010, almost two years prior to Jarrell's evaluation, and these psychologists did not have the benefit of reviewing the bulk of the notes from O'Dell and Burke, as did Jarrell. I also note that by Livesay's report, her symptoms of depression worsened in the year before being evaluated by Jarrell. (R. at 499.)

While the ALJ stated that he was according minimal weight to Jarrell's opinion because it was rendered several years after Livesay's alleged onset date, I find that this is not a valid reason to discount the opinion. All that Livesay must show is that she had a disabling condition that had lasted or could be expected to last for 12 consecutive months during the relevant time period. It does not matter

whether this consecutive 12-month period included the alleged onset date. In that same vein, the ALJ stated that he was according Jarrell's opinion minimal weight because there was no evidence that the level of impairment found by Jarrell had lasted, or could be expected to last at least 12 consecutive months. I disagree. In Jarrell's assessment, she opined that the limitations, as assessed, had lasted or could be expected to last at least 12 continuous months. Additionally, in March 2012, Dr. Ford opined that Livesay's impairments had lasted or could be expected to last for at least 12 months.

Based on the above, I find that substantial evidence does not exist in the record to support the ALJ's rejection of the opinions of Jarrell regarding the effects of Livesay's mental impairments on her work-related abilities. Therefore, I find that substantial evidence does not support the Commissioner's decision to deny benefits, and I will remand the case to the Commissioner for further consideration. An appropriate order will be entered.

DATED:     September 10, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE